**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANGELA LUPE,**

                              **Plaintiff,**

                                                            **1:10-CV-198**
        **vs.**                                             **(MAD/ATB)**

**ERIC K. SHINSEKI, as Secretary of the**
**Department of Veterans Affairs,**

                              **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

O'CONNELL and ARONOWITZ                   Kurt E. Brattan, Esq.
54 State Street
Albany, New York 12207-2501
_Attorneys for Plaintiff_

RICHARD S. HARTUNIAN                      William F. Larkin, Esq.
UNITED STATES ATTORNEY                    Asst. United States Attorney
218 James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207
_Attorney for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Plaintiff Angela Lupe ("plaintiff") brings this action pursuant to the Rehabilitation Act of

1973, 29 U.S.C. §§ 701–796l ("Rehabilitation Act") and 42 U.S.C. § 2000e et seq. ("Title VII")

based on employment-related disability discrimination, harassment and retaliation.  Presently

before the Court is defendant's motion for summary judgment and dismissal of plaintiff's

complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 20).  Plaintiff

opposes the motion.  (Dkt. Nos. 22 - 25).

## FACTS AND BACKGROUND[1]

The record contains few undisputed facts. Plaintiff is a veteran of the United States Army and participated in a fourteen month deployment to Iraq in February 2003. In January 2005, plaintiff was honorably discharged from the Army. In April 2008, plaintiff became employed by the Veterans Administration ("VA") as a Veterans Integrated Service Network 2 ("VISN2") administrative support assistant. Barbara Casey ("Casey") was employed as an administrative officer within VISN2 and was plaintiff's immediate supervisor. From 2004 until 2010, Linda Weiss ("Weiss") was the VISN2 Deputy Director and was Casey's immediate supervisor. Frances Peters ("Peters") was employed as the network health benefits officer for VISN2 and the Operation Enduring Freedom/Operation Iraqi Freedom contact person. Donna Dardaris was a

---

[1] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3)(emphasis in original).

Defendant filed a Statement of Material Facts and plaintiff properly responded. Plaintiff also set forth additional material facts. Defendant did not respond to these additional assertions in the reply submission. The background set forth in this section is taken from: (1) defendant's Statements of Material Facts and plaintiff's responses therein; (2) the exhibits and evidence submitted by defendant in support of the motion for summary judgment; and (3) the exhibits and evidence submitted by plaintiff in opposition to the motion for summary judgment. To the extent that the "facts" asserted by plaintiff in the Statement of Material Facts are supported by the record, the Court will consider them in the context of the within motion. The facts recited are for the relevant time period as referenced in the complaint.

health systems specialist and considered Weiss a "close friend" whom she has known her for at least twenty years.  Dardaris testified that she reported to Tom Sharpe, the Chief Financial Officer not to Weiss.  Dardaris had no responsibilities with regard to plaintiff.

Casey and Peters described plaintiff as an "excellent" employee.  The VISN2 office was located in a converted two story apartment building known as Building Number 7 on the grounds of the Veterans Administration Medical Center.  Weiss' office was on the first floor in a small area that was formerly an enclosed porch and approximately 9 x 12 in dimension.   When plaintiff began working in Building Number 7, her office was located on the second floor.

During the course of plaintiff's employment at VISN2, plaintiff was periodically absent to attend medical appointments to treat, *inter alia*, plaintiff's diagnosed Post Traumatic Stress Disorder ("PTSD").   Plaintiff advised some of her co-workers of her difficulties.  In a treatment noted from May 21, 2008, Elizabeth P. Donovan, plaintiff's Clinical Social Worker, noted that plaintiff was the primary caregiver for her stepson who suffered from Downs Syndrome and exhibited "challenging behavior".  The VA has a formal process utilized in the evaluation of formal reasonable accommodation requests.  VA policy specifies that a reasonable accommodation request be acted upon within ten days of receipt of the completed package.

After plaintiff began working at VISN2, she began to ambulate with a cane.[2]  Casey noticed that plaintiff was having difficulties walking and asked Weiss to move plaintiff's office to the first floor.  Weiss asked plaintiff whether she felt confident making her way to her work area on the second floor and plaintiff stated that she was fine.  Weiss later observed plaintiff going to the second floor by sitting on the stairs and lifting herself up to the next step.  Plaintiff reiterated that she was fine.  However, Weiss moved plaintiff's office to the first floor.

---

[2] There is conflicting testimony with regard to when plaintiff began using a cane.

3

During the winter of 2008 and 2009, Casey noticed plaintiff "struggling" to walk.  In or around April or May 2009, plaintiff began to use a wheelchair.  Casey and Weiss observed plaintiff in the wheelchair at work.  As a result of plaintiff's wheelchair use, the lip on the ramp into the building was removed.  During the latter part of March 2009, plaintiff advised Weiss and Casey that she was having difficulty with mobility and no longer felt confident to drive.  Plaintiff, Weiss and Casey discussed the possibility of plaintiff using the STAR bus for transportation to work.[3]

In April 2009, plaintiff began using the STAR bus for transportation to work.  On May 26, 2009, Casey and plaintiff had a meeting.  Casey later summarized the meeting in an email sent to plaintiff at 12:56 p.m.  The email provided, in pertinent part: "tour changes can only be made when requested to me for approval first and then final approval by Linda [Weiss].  If I deny the request you have the right to go directly to Linda for her approval/denial.  Tour changes also must be requested ahead of time at least a week in advance, and cannot randomly be made.  Also flex time is not used here".  Plaintiff confirmed the earlier conversation noting, "if flex time is not going to be an option for me for a little while, then I will need to look into alternatives, however that may happen.  My bus can go 10 business days out in schedule . . . but it wouldn't be consistent even if Gage wasn't in the picture".  Casey replied, "[w]e will still meet with Linda regarding advanced noticed tour changes for a specific time period as discussed which I guess I left out of the message below and if approved then we can proceed with that".  Plaintiff concluded the email exchange with "Ok.  However the chips may fall . . . I left my weapons in Iraq".

On May 26, 2009 at 1:38 p.m., minutes after plaintiff's email exchange with Casey, Suzanne H. Deane, Polytrauma Case Manager, entered the following Progress Note:

---

[3] STAR is an acronym for "Special Transit Available on Request".  See http://www.cdta.org (last visited August 7, 2012).

> T/C from plaintiff with questions about disability, FMLA, etc. as she is having difficulty in the workplace maintaining a schedule and is having issues with childcare for her son. States she has a meeting with her managers this afternoon and is nervous about the outcome and is thinking of just "quitting". Writer explained disability - SSD, VA disability programs and that they take a long time to apply and to receive approval. Encouraged [plaintiff] to remain in her job and find alternative arrangements while keeping her employment such as using FMLA or speaking to the EEO office for additional support with reasonable accomodations [sic].

On May 28, 2009, Donovan made the following Progress Note:

> 60 minute session requested by [plaintiff] to discuss problems she is having in the workplace, related to her medical conditions and wheelchair level mobility. She needs to start PT [physical therapy], she needs wheelchair van transportation (which is not affordable or available privately in this area) and reports that her supervisors at the job site may not fully understand her needs for accommodation. Sometimes not able to go to work due to not sleeping well, and having trouble with schedule and transportation. Suzanne Dean [sic], OEFOIF case manager joined the session at the end, to provide additional support regarding the employment concerns. By the end of the session, Ms. Lupe had the needed forms to review/complete for Accommodation requests as well as Family Medical Leave usage. Initially, she stated that she did not want to ask for her employment rights, by the end of the meeting, she was willing to review the guidelines and work with her health providers to pursue this step by step. She has been anxious and depressed lately, she has sent several emails about how worried and frustrated she has been. Financial and family care pressures are contributing to the anxiety and frustrations, as well has [sic] her changes in health status.

Sometime between the end of May 2009 and June 1, 2009, plaintiff provided Casey with a proposed work schedule for the entire month of June. Plaintiff told Casey, in general conversation, that it would be better for her to work from home because of her son's schedule and problems with transportation to school. Plaintiff also provided Casey with a Request for Accommodation.[4]

---

[4] The Request for Accommodation is annexed to plaintiff's affidavit in opposition to defendant's motion and was properly authenticated by plaintiff. The request is undated. During her deposition, plaintiff stated that she could not recall the exact date that she made the request "believes" it was the end of May 2009.

In plaintiff's accommodation request, plaintiff indicated that she wanted to work from home two days per week on Monday and Friday and to adjust her hours to facilitate STAR bus transportation.  Plaintiff described her medical condition and how it interfered with her performance, conduct and/or attendance:

> (1) I cannot bathe or fully dress myself most days.  (2) I push myself to do daily tasks and what I can't my spouse does.  (3) I can't walk or stand.  (4) Difficulty sleeping.  (5) Incontinence from Iraq.  Loss of independence in many ways physically has made my PTSD worse and Army Pride hurt.  I am used to being a "do-er" and I now physically can't.  I can't even play with my son like I used to or drive my car.

On June 1, 2009, plaintiff emailed her social worker, Elizabeth Donovan, and advised that she gave the accommodation paperwork to Casey.  Donovan replied that she spoke with Kara Merendo[5] and that plaintiff needed to take copies of the request to Jane Curtin[6] "for accommodation and person with disability" and instructed plaintiff that, "[o]nce HR gets your requests, the turn around time is 10 days or so to respond.  People can't just say no.  What they usually do is bring people to the table, and address the accommodation.  You can request that I be there if you want".

On June 1, 2009, plaintiff met with Weiss and Casey for approximately forty minutes in Weiss' office.[7]  Plaintiff was told that her request for temporary accommodation was unworkable.  After meeting with plaintiff, Weiss called for an EEO representative.  Weiss and Casey met with Kara Merendo for approximately thirty minutes.

On June 1, 2009, plaintiff had an urgent visit with Donovan.  Donovan prepared a Progress Note that indicated:

---

[5]  At the relevant time, Ms. Merendo was the EEO officer.

[6]  At the relevant time, Ms. Curtin was employed in the Human Resources department.

[7]  Weiss, Casey and plaintiff offer conflicting accounts of what transpired in Weiss' office.

"Presenting problem: She had a surge of PTSD symptoms at work today, as she describes a panic attack during a supervisory meeting to discuss her pending request for FMLA and accommodation of her physical disabilities.  She states she was forced into a small office, and a manager was speaking loudly and at close range.  She became overwhelmed, tearful, panicky.  She was encouraged by her supervisor to be seen by undersigned for mental health today, and also has appointments in Rehab Medicine today for physical therapy.  She has significant medical problems, with pain and limits on her mobility.  Also family problems have been adding to her stress level (see previous notes), which have increased her PTSD symptoms.

On June 2, 2009, Deane prepared a Progress Note:

Rec'd voicemail message yesterday from [plaintiff] . . . [plaintiff] states that she has been in contact with EEO office and is working with the EEO representative.  She reports that she is doing better today and is back at work.

On June 4, 2009, Donovan prepared the following entry:

Workplace issues exacerbated PTSD symptoms yesterday. Undersigned was away at training, but spoke to [plaintiff] by phone yesterday and today.  Yesterday she stated that in the process of trying to make arrangements to use Family Medical Leave Act benefits to arrange for her health care needs, she has been called in to meetings abruptly, with closed doors, with an administrator who she feels in unsympathetic; further, she overheard the manager discussing her personal situation in the lunch room with another administrator in an unrelated department.  When she asked the administrator why her personal situation was being discussed in a public place, the administrator reportedly told her that she (the admin.) Had the right to vent to a peer.  The [plaintiff] is trying to work within the EEO and Human Resources processes for leave use and now exploring privacy violations.    Assessment:  workplace  stressors,  health  stressors, complicating her PTSD at this time.  She is feeling harassed, unsafe. She states she is having intense anxiety, is not sleeping well, does not feel she can go back to work at this time because of how anxious she is feeling.

On June 2, 2009, plaintiff reported to work.  On the same day, a note from Dr. Jeffrey J.

Burdick, one of plaintiff's treating physicians, was faxed to plaintiff's office.  The letter

supported plaintiff's request to "work from home two days a week for approximately three months".[8]

On June 3, 2009, plaintiff reported for work and overheard a conversation between Weiss and Dardaris regarding plaintiff's medical information and accommodation request.[9]   Dardaris admitted that she had an earlier morning conversation with Weiss in the kitchen of the Network office and testified that during the conversation, the kitchen door was open and she assumed that they we were the only people in the building.   Dardaris could not recall how the conversation started but testified:

> I believe Linda said - - I don't even remember all of it.  I remember - - I felt bad for Angie and I remember expressing that, because - - and I don't have any clinical background, but just observing her, it at least appeared to me that she had some sort of progressively deteriorating medical condition or some condition that was really impinging on her functioning, not in her job, but her physical functioning as far as her mobility went.  And I don't really know how the conversation went from there.
>
> I know that I might have asked Linda, was there anything we could do, isn't there anything we could do for Angie, like flex time or something.
>
> And Linda said they had already let her change her hours  [. . .]

Dardaris continued:

> I remember that we were talking about Angie, and I said, I feel so bad for her.  I said, I don't understand why they can't figure out what's going on with her.  And, as I said, I have no clinical knowledge, but Angie went, from the time she started working with us, from being very mobile.  She had an office upstairs, the stairs with no problem, was driving her own car, to  - - by the time I recall having this conversation, she wasn't driving, she was riding the Star bus to work, she couldn't do stairs, she couldn't walk without - - she went to using

_____

[8] The letter is not in proper admissible form.  The parties do not dispute the contents of the letter and therefore it will be considered on the within motion.

[9] Plaintiff provided only a vague summary of the substance of the conversation.

a cane, she was walking hanging onto walls and she had a cane, then she was in a wheel chair.  So at least it appeared to me she had something very debilitating going on.

Dardaris stated:

> Q.   You told me, you said that you felt bad for Angie and you had asked if there was anything you could do for her.  What else was said in the conversation?
>
> A.   You know, I can't recall it perfectly.  I believe - - I think I specifically asked about flex-time, if there wasn't a way to flex her hours.  And Linda said, we have already adjusted her hours according to the schedule she asked us for.  And I think there was - - there was something else about Angie wanted a further change made, but Linda indicated it had to do with childcare more than her disability.

Dardaris testified that Weiss did not say anything negative about plaintiff but admitted that Weiss may have made comments about plaintiff's medical condition.  Dardaris was "surprised to some degree" that Weiss would discuss plaintiff's private issues.

Weiss admitted that she and Dardaris discussed plaintiff's request for accommodation but explained that:

> A.   I asked Miss Dardaris - - Mrs. Dardaris if she was going to be in the office.  And she said yes.  And I said, good, I intend to be on travel either tomorrow or early next week.  And as she was one of the senior health systems specialists, that there were a few issues that the rest of the staff may need some guidance or support on.  And I said that, you know, particularly Barbara, if there's any issues that came up in terms of processing the request for reasonable accommodation for Ms. Lupe.

Weiss continued to explain that, "[this was] an issue that we were working on, wanted to keep it moving forward and that we were trying to be as supportive as possible of Ms. Lupe, she was having a difficult time".

9

Plaintiff reported the incident to the VA's EEO representative, Kara Merendo.  Ms. Merendo advised plaintiff to discuss the matter with Weiss.  The same day, plaintiff met with Weiss in Weiss' office.  The parties dispute what occurred during that conversation however, plaintiff admits that she asked Weiss about resigning.  After plaintiff's conversation with Weiss, plaintiff's co-worker, Yvonne Natale, observed plaintiff crying.

On June 3, 2009, at 9:20 a.m., plaintiff sent an email to Peters with attachments.  Peters sent an email asking, "[w]hat is this please??"  Plaintiff responded with a second email at 9:26 a.m. and stated:

> Bombarded you with attachments.  I am quitting right now.  If you weren't able to get stuff I sent I am sure IS can get into my computer for it.  More stuff.  And even this will be read by Linda.  But I guess an email I sent you that you sent to barb got to Linda.  Etc. etc. etc. Sorry to leave you like this.  With so much.  We will talk soon.  Safe journeys.

Plaintiff telephoned her brother to pick her up and immediately went outside.  The record contains conflicting accounts of the events that transpired after June 3, 2009 and the contradictory accounts will be discussed in detail *infra*.  However, the parties agree that plaintiff did not return to her employment with the V.A. after June 3, 2009.

On July 29, 2009, plaintiff applied for Supplemental Security Income.  At the time of her deposition, plaintiff was receiving monthly Social Security Disability benefits.  On February 19, 2010, plaintiff filed a complaint in this Court asserting four causes of action: (1) discrimination based on disability; (2) retaliation; (3) a hostile work environment; and (4) failure to provide a reasonable accommodation.  (Dkt. No. 1).   Plaintiff claims that she suffered from adverse employment actions, including but not limited to termination/constructive discharge as a result of the first three causes of action.

## DISCUSSION

Defendant moves for summary judgment and dismissal of plaintiff's complaint in its entirety.

## I.   STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56 ( c ). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 258 (1986). A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id.* If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F .3d 81, 86 (2d Cir.1996) (citing Fed.R.Civ.P. 56 ( c ).  In applying this standard, the court should not weigh evidence or assess the

credibility of witnesses.  *Hayes v. New York City Dep't of Corr.*,  84 F.3d 614, 619 (2d Cir. 1996)

(citation omitted).  These determinations are within the sole province of the jury.  *Id.*

## II.      REHABILITATION ACT

"Section 501 of the Rehabilitation Act establishes a program within the federal

government to encourage the employment of individuals with disabilities, and applies to '[e]ach

department, agency, and instrumentality (including the United States Postal Service and the

Postal Rate Commission) in the executive branch' ".  *Rivera v. Heyman*, 157 F.3d 101, 103 (2d

Cir. 1998) (29 U.S.C. § 791(b) (1994)).  Section 504 of the Rehabilitation Act provides that "[n]o

otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability

... be subjected to discrimination under any program or activity receiving Federal financial

assistance or under any program or activity conducted by any Executive agency."  *Id.* (citing 29

U.S.C. § 794(a)).  "[S]ection 504 is enforceable through Title VI of the Civil Rights Act of 1964,

which provides (*inter alia*) for the termination of federal financial assistance to recipients who

discriminate in violation of section 504."  *Id.* (citing 42 U.S.C. § 2000d-1 (1994)).  As a federal

employee, plaintiff's claims are governed by the Rehabilitation Act.

The plaintiff in a Rehabilitation Act suit bears the initial burden of establishing a *prima*

*facie* case under the Act.  *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994).  Courts

analyze claims of intentional discrimination under the Rehabilitation Act with the *McDonnell*

*Douglas* burden-shifting analysis established for employment discrimination cases under Title VII

of the Civil Rights Act of 1964.  *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*,

294 F.3d 35, 48 -49 (2d Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973)). "If the plaintiff makes out a *prima facie* case, then the burden of production shifts to the

defendants to provide a legitimate, nondiscriminatory reason for their employment decision."

*Reg'l Econ. Cmty. Action Program, Inc.,* 294 F.3d at 48-49. (citations omitted).  If the defendants meet that burden, the plaintiff must then prove that the stated reason is mere pretext for discrimination, i.e., that the defendants intentionally discriminated against them on a prohibited ground.  *Id.*  If, "the plaintiff makes a substantial showing that the defendant's proffered explanation was false, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id*. (citations omitted).

Although the Act forbids employment discrimination based on disability, "an employer is entitled to make employment decisions based on the 'actual attributes of the handicap.' " *Mattison v. Potter*, 515 F.Supp.2d 356, 375 -376 (W.D.N.Y. 2007) (citing *Teahan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 515 (2d Cir.1991)).  If the employer relies upon the employee's disability as the reason for the adverse employment action, it is the employer's burden to rebut the inference that the disability was improperly considered by demonstrating that the disability is relevant to qualifications for the position.  *Heilweil*, 32 F.3d at 722.  An employer relies on an employee's disability if the employer takes an adverse job action against the employee "solely be reason of" his disability. *Mattison*, 515 F.Supp.2d at 376 (citing *Teahan*, 951 F.2d at 515).  "The ultimate burden remains the plaintiff's to prove he is qualified for the position despite his disability."  *Id*. (citations omitted).

"A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation' ".  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted).  In this matter, plaintiff's discrimination claim is based on two theories: failure to make reasonable accommodations and intentional discrimination.

## A.     REASONABLE ACCOMMODATION

Plaintiff claims that defendant discriminated against her by failing to make a reasonable accommodation.  "A plaintiff can make a *prima facie* showing of failure to make a reasonable accommodation under the Rehabilitation Act by establishing (1) that she is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of her disability, (3) that with reasonable accommodation, she could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations".  *Carter v. Potter*, 2008 WL 1848639, at *5 (E.D.N.Y. 2008) (citing *Stone v. City of Mt. Vernon*, 118 F.3d 92, 96 (2d Cir. 1997)).

### 1.    Qualified Individual

The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (c) being regarded as having such an impairment.  42 U.S.C. § 12102(2).   The Second Circuit has applied the three-step approach to determining whether an individual is disabled:

> Plaintiff must first show that she suffers from a physical or mental impairment. Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." Third, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified.

*Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002).  The term "major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Weigand v. Niagara Frontier Transp. Auth.*, 2010 WL 584021, at *7-8  (W.D.N.Y. 2010) (29 C.F.R. § 1630.2(i)).  Courts may consider the following factors in this analysis: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact,

14

or the expected permanent or long-term impact of or resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

The Supreme Court has held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into account when judging whether that person is 'substantially limited' in a major life activity." *Bartlett v. New York State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 2000) (citing *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999). However, the use of corrective devices or mitigating measures "does not, by itself, relieve one's disability." *Sutton*, 527 U.S. at 488. "For example, individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run. The same may be true of individuals who take medicine to lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited." *Id.*

Here, plaintiff claims that she suffers from an impairment, PTSD, that substantially limits her ability to walk. Plaintiff's impairment is well documented and defendant does not dispute that plaintiff suffers from PTSD. *See Felix v. New York City Transit Auth.,* 154 F.Supp.2d 640, 653-654 (S.D.N.Y. 2001) (the plaintiff suffered from PTSD for approximately four years and while the condition was not permanent, it was of sufficient duration to qualify as an ADA impairment). Factfinders do not need expert testimony to understand that a person confined to a wheelchair is substantially limited in the major life activity of walking. *E.E.O.C. v. Yellow Freight Sys., Inc.*, 2002 WL 31011859, at *15 (S.D.N.Y. 2002) (citation omitted); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 22 (1st Cir. 2002) (citing *Sutton*, 527 U.S. at 488) (explaining that "individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to

walk or run")).  As a matter of law, the Court finds that plaintiff is disabled within the meaning of the Act.

### 2.    Notice of Disability

Plaintiff has no duty to provide medical documentation supporting her disability when the disability is obvious.  *Bohen v. Potter*, 2009 WL 791356, at *15 (W.D.N.Y. 2009) (the plaintiff wore a surgical boot to work everyday and his ability to walk was described as "slow and with a noticeable gait").  Here, defendant does not dispute that plaintiff was diagnosed with PTSD but argues there is no evidence that plaintiff's colleagues were aware of her condition, "other than the physical deterioration which they observed on a daily basis".

Upon review of the record, the Court finds more than sufficient evidence that plaintiff's co-workers and supervisors were aware of plaintiff's disability.  The witnesses testified that they noticed plaintiff experiencing mobility difficulties and observed her ambulate with a cane and ultimately, a wheelchair.  Weiss moved plaintiff's office to the first floor from the second floor after she observed plaintiff experiencing difficulties negotiating the stairs.  Weiss and Casey knew that plaintiff used the STAR bus for transportation to work due to her lack of confidence in her driving ability and Casey admitted that a lip on the ramp into the building was removed after plaintiff began using a wheelchair.

Based upon the record, a reasonable jury could find that plaintiff displayed an obvious disability and therefore, defendant had knowledge of her condition.

### 3.    Perform Essential Functions With Reasonable Accommodation

A qualified individual with a disability must be able to perform the essential functions of that position.  *Felix*, 154 F.Supp.2d at 656. The Second Circuit has held:

> The plaintiff bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question. A

16

> plaintiff cannot be considered otherwise qualified unless she is able, with or without assistance, to perform the essential functions of the job in question. It follows that the plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions.

*Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137–8 (2d Cir.1995).

Whether the employee is "otherwise qualified" as of the date of an adverse action is forward-looking and enables the employer to consider how the employee will perform as compared to non-disabled individuals. *Teahan*, 951 F.2d at 521. "[T]he 'otherwise qualified' inquiry asks whether the plaintiff will be able to do the job." *Messer v. Bd. of Educ. of City of New York,* 2007 WL 136027, at *11 (E.D.N.Y. 2007) (citing *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)).

Defendant contends that plaintiff made admissions to the Social Security Administration ("SSA") regarding her ability to perform her job. To wit, defendant claims that plaintiff advised SSA that she was disabled and unable to perform her essential job functions as of June 3, 2009. Defendant also claims that plaintiff's "attendance issues" rendered her unable to perform the essential functions of her job.

### a.    Social Security Benefits

Under the Social Security Act, a claimant is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 992 F.Supp. 395, 405 -406 (S.D.N.Y. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). "Unlike the ADA, the Social Security Act does not address the effect of reasonable accommodation on the individual's claim." *Id.* "[T]he Supreme Court has held that the pursuit and receipt of Social

Security disability benefits, without more, neither estops the recipient from pursuing an ADA claim nor creates any special presumption against the recipient showing, for purposes of an ADA action, that with reasonable accommodation he or she could perform the essential functions of the job." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 -7 (2d Cir. 1999) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999)); *see also Bohen*, 2009 WL 791356, at *9 (citation omitted) (the receipt of Worker's Compensation Benefits and Social Security Disability Benefits "does not automatically bar a claim [. . . ]").  However, "[a] plaintiff who is receiving disability benefits must proffer a 'sufficient explanation' for why she asserted total disability in the agency proceeding while maintaining that she was a 'qualified individual with a disability' in the ADA action." *Bohen,* 2009 WL 791356, at *9. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror to conclude that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id*. (citing *Nodelman v. Gruner & Jahr USA Pub.*, 2000 WL 502858, at *8 (S.D.N.Y. 2000) (internal citations omitted)).

    In this matter, plaintiff does not dispute that she received social security benefits but claims that while the SSA determined that she was "disabled as of June 1, 2009", she never made any statement to the SSA regarding her ability to perform her job at VISN2.  Plaintiff claims that the document, upon which defendant relies, was prepared by the SSA and that it is not her own sworn statement.  The Court has reviewed the document and the other documents relating to plaintiff's social security benefits and finds that the record does not contain any sworn statement from plaintiff, document executed by plaintiff or any administrative hearing transcripts.  There is no evidence establishing that plaintiff claimed or represented to SSA that she was totally disabled

as of June 1, 2009 and unable to perform her job at VISN2 without reasonable accommodations. *See Marvello v. Chemical Bank*, 923 F.Supp. 487, 491 (S.D.N.Y. 1996) (the Court has no evidence as to what statement the plaintiff might have made to the Social Security Administration about his condition).  Without any such admissions, the Court cannot conclude as a matter of law that plaintiff was unable to perform the essential functions of her job at VISN2 solely because she pursed social security benefits.  *See Fussell v. Georgia Ports Auth.*, 906 F.Supp. 1561, 1575–76 (S.D.Ga.1995) (while "there is every reasonable inference" that plaintiff swore to being totally disabled "given the working framework of the SSI program," since there was no direct evidence in the record that plaintiff swore to disability, summary judgment denied); *see also Mohamed v. Marriott Int'l, Inc.*, 944 F.Supp. 277, 283 (S.D.N.Y. 1996) ("[i]n light of th[e] differing legal standards, [the plaintiff's] assertion of inability to work for SSDI purposes is not necessarily inconsistent with his claim of being capable of performing the essential functions of the job from which he was discharged"); *cf. DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 105 (2d Cir. 2010) (the record is clear that the plaintiff  had physical limitations, and that he felt he needed to work from home and therefore, "it is hardly surprising that he said on the disability application forms that he was disabled or unable to grab, reach, or commute").

    **b.    Attendance Issues**

    An individual who is incapable of regular attendance or unable to come to work is not otherwise qualified.  *Bohen*, 2009 WL 791356, at *9; *see also Bobrowsky v. New York City Bd. of Educ.*, 1999 WL 737919, at *4 (E.D.N.Y.1999), *aff'd mem.*, 213 F.3d 625 (2d Cir. 2000) ("[t]here could be no reasonable accommodation because attendance is an essential function of her employment").  Summary judgment is warranted when the defendants provide enough evidence "to permit [the Court] to rule, as a matter of law, that allowing [the plaintiff] to work a fully

flexible schedule would prevent him from performing the essential functions of his job". *Varone v. City of New York*, 2003 WL 21787475, at *15 (S.D.N.Y. 2003).

Here, the parties do not dispute that plaintiff had "attendance issues".  However, the Court cannot conclude, as a matter of law, that these attendance issues rendered plaintiff unable to perform the essential functions of her job.  Plaintiff's supervisors were aware of the issues regarding plaintiff arriving on time to work with the STAR bus.  Weiss testified that if plaintiff boarded the bus at 9:00 a.m., it could take several hours for her to arrive at work.  Despite this problem, Weiss testified that they were "working with plaintiff's schedule".  Weiss also testified that due to "extraordinary" personal issues in plaintiff's life, she intended to work with plaintiff in two week blocks to accommodate her schedule.

Further, the record in this case is far from clear about the essential functions of plaintiff's position.  Weiss testified that formal administrative hours were 8:00 a.m. to 4:30 p.m. but that "multiple staff" worked 7:00 a.m. to 3:30 p.m. or 9:00 a.m. to 5:30 p.m. Weiss provided testimony with regard to plaintiff's position when presented with a copy of the VA's "Position Description"; however the record contains conflicting testimony with respect to how much, if any, of plaintiff's job required her to be present in the workplace.  For example, Weiss testified that phone and reception coverage were part of plaintiff's duties however, when asked how many times plaintiff was previously asked to provide phone coverage, Weiss testified, "I don't know".

The Court finds that defendant has not provided competent, admissible evidence to support the contention that plaintiff's attendance issues rendered her unable to perform her essential functions or whether plaintiff's physical presence at the VISN2 offices was required. *See King v. Town of Wallkill*, 302 F.Supp.2d 279, 290 (S.D.N.Y. 2004).  Accordingly, the Court

finds that the issue of whether plaintiff was "otherwise qualified" to perform her job must be determined by the jury.

### 4.      Failure to Provide Reasonable Accommodations

Plaintiff argues that defendant failed to accommodate plaintiff by refusing to alter her work schedule.  Plaintiff claims that defendant failed to engage in the interactive process and denied her request, threatened her and terminated her.  Plaintiff "adamantly denies" that she resigned.  Defendant argues that plaintiff submitted an incomplete request for accommodation on June 1, 2009 and then, two days letter, resigned before defendant could review and respond to plaintiff's request for accommodation.  Defendant argues that based upon plaintiff's emails to Peters, Casey's testimony and plaintiff's co-workers' testimony, there is no question that plaintiff resigned.

### a.      Law

"Reasonable is a rational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Borkowski*, 63 F.3d at 138. The analysis requires an inquiry not only into the benefits of the accommodation but into its costs as well. *Id.* (an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce). "The plaintiff has the burden of establishing that an accommodation be reasonable, i.e., the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* (the burden on plaintiff is not "a heavy one").  Once the plaintiff has made out a *prima facie* showing that a reasonable accommodation is available, the employer can defeat the claim if it shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship would be undue.  *Nakis v. Potter*, 2004 WL 2903718, at *14 (S.D.N.Y. 2004).  The burden of proof on these two issues is on

the employer. *Id.* (citing *Stone*, 118 F.3d at 96). The Second Circuit has held that a "reasonable accommodation" may include such adjustments as modification of physical facilities, work schedules, or equipment, or some job restructuring. *Carter*, 2008 WL 1848639, at *5 (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir.1991) (citation omitted)). However, it does not incorporate "elimination of any of the job's essential functions." *Id.* An essential function "encompasses more than core job requirements; indeed, it may also include scheduling flexibility". *Reville v. Niagara Frontier Transp. Auth.,* 2009 WL 5167645, at *8 (W.D.N.Y. 2009) (citation omitted). With respect to requests for schedule or shift changes, if the plaintiff seeks to, "mak[e] defendant create a new job for [her] . . . . Such accommodation is not reasonable since it would permit plaintiff to work shifts different from those of all other [similarly situated employees]. This not only eliminates an essential function of [plaintiff's] position but it also creates an entirely new position and imposes an additional burden on [plaintiff's] co-workers." *Bogner v. Wackenhut Corp.*, 2008 WL 84590 at *6 (W.D.N.Y. 2008); *see also Melrose v. New York State Dep't of Health Office of Prof'l Med. Conduct*, 2011 WL 1431981, at *8 (S.D.N.Y. 2011) (granting a schedule change would have contributed to the plaintiff's unreliability, low productivity and attendance problems).

Federal regulations provide for "an informal interactive process" between the employer and employee to identify a reasonable accommodation for the employee. 20 C.F.R. §1630.2(o)(3). Although the covered entity is required to initiate an interactive process, the ADA also requires that the employee participate and specify fully the necessary accommodations and options. *Witchard v. Montefiore Med. Ctr.*, 2009 WL 602884, at *16 -17 (S.D.N.Y. 2009) (after receiving the request for accommodation, the employer scheduled conferences, communicated with the plaintiff's doctors and identified a new position for the plaintiff). The employee's

22

cooperation and continued engagement is of paramount importance. *Id.* (citing *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996)). "[I]t is clear that the employee and the employer are required to participate, in good faith, in the 'interactive process' of arranging a reasonable accommodation, and that a plaintiff who causes the breakdown of the interactive process may not recover. *Nugent v. St. Lukes–Roosevelt Hosp. Ctr.*, 2008 WL 5341379 at *2 (2d Cir. 2008) (citing 29 C.F.R. § 1630.2(o)(3)); *Winbush-Jones v. Potter*, 2009 WL 497637, at *11 (W.D.N.Y. 2009) (the plaintiff left work emotionally distraught without subsequently contacting her employer or making any further request for accommodation) (citing *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 740 (5th Cir.1999) (district court properly granted judgment as a matter of law to defendant-employer, where plaintiff quit rather than giving employer an opportunity to continue with the interactive process). When there is a genuine issue of fact as to who is responsible for obstructing the process, summary judgment is improper. *Bohen*, 2009 WL 791356, at *14.

###### b.     Relevant Deposition Testimony

The witnesses provide conflicting and somewhat contradictory testimony with regard to the events that transpired at the VISN2 offices on June 3, 2009.

Plaintiff testified that on June 3, 2009, she arrived at the office between 6:30 am and 8:00 a.m. and overheard a conversation between Weiss and Dardaris. Plaintiff testified that Weiss was providing Dardaris with details concerning plaintiff's personal medical issues and her accommodation request. Upon overhearing the conversation, plaintiff testified that she called the "EEO person", Kara Merendo who advised plaintiff to speak with Weiss. Plaintiff testified that when she confronted Weiss. Plaintiff testified about the discussion during the meeting:

> A.     In talking about how I was feeling at that moment, and she had
> said that the accommodation request would be denied and this

> would be denied and everything, we had talked - - well, I had
> said that I didn't know if in good conscience I could still work
> there.  And I had left the office.  I mentioned to her what is
> involved in resigning.  I asked her questions about that.  Her
> answer was she was going to have Barb get paperwork for me
> to look at.  I went back to my desk.

Weiss testified that during the June 3, 2009 meeting in her office, plaintiff asked Weiss to

fire her and when Weiss refused, plaintiff said she "will resign immediately because morally and

ethically I do not feel I can - - that this place -  - I can't work here any longer and support this

organization in its work for veterans".  Weiss testified that plaintiff asked what she needed to do

to resign and Weiss informed her that she needed to see Casey so that a "Form 52" could be

generated:

> Q.    And that she would need to sign it, Miss Lupe would need to
>        sign it?
>
> A.    No.  Ms. Lupe never needed to sign it.
>
> Q.    Did you tell Ms. Lupe that you would speak to Miss Casey and
>        have her generate the 52?  Or did you simply direct Miss Lupe
>        to go speak to Miss Casey?
>
> A.    I said to Ms. Lupe, you need to see Barbara.  Ms. Lupe left my
>        office.  I walked over to see Ms. Casey, and Ms. Casey said,
>        Angela told me she is resigning immediately and I need to
>        generate a, you know, generate a 52.  And I said, that's exactly
>        what she told me, she was resigning effective immediately.

During Casey's deposition, she was presented with a copy of a document entitled

"Request for Personnel Action".[10]  Casey testified:

> A.    . . . I remember Angela coming in and asking me to fill it out.
>
> Q.    What did she say?

---

[10] The document is part of Exhibit "G" annexed to defendant's motion.

A.   I was in my office and she came in and said, Linda said to do a 52 for me.  And I said why.  She said, I'm resigning.  And I said, well, don't - - let's talk.  She said, just do it, I'm packing my things, I'm leaving.  So I got the form ready.

Casey testified that she completed portions of the form but that plaintiff and employees from Human Resources were responsible for completing the remainder of the form.  Casey testified that plaintiff's signature was not required but that, "they prefer to have a statement".  Casey stated that plaintiff would not speak with her and the last time she saw the form was when she handed it to plaintiff.

Plaintiff testified that Casey provided her with only the last page of the form and, at the time of the deposition, plaintiff had the form, unsigned, at home.  Plaintiff testified:

A.   I set it aside.  It's like that's not information that's not information that's the last page of something, and I'm not signing anything because I'm not resigning.  I knew at that point that I needed to see my therapist, and I was just so overwhelmed with what was going on that I knew that my therapist could, at least FMLA-wise get that through for me to take at least a few days off given what was going on.  So I took some of my work that I was working on that needed like immediate stuff and gave it to a couple of people for Fran."

Pltf. Dep. at p. 38.

Plaintiff testified that she emailed Peters because Peters was out of the office on June 3, 2009.  Plaintiff conceded, "I know there was one email in particular where I had mentioned resigning".  Pltf. Dep. at p. 39.  The emails are part of the record herein.

Plaintiff testified that she called her brother to pick her up and while she was waiting for him, she put paperwork together for Peters and "packed up a little bit of my personal stuff that I knew I would need immediately".  Plaintiff decided to see her therapist and claims that she prepared "a handwritten note requesting leave without pay for the day at the advice of somebody in the office, and I gave that to Linda before I left".  Plaintiff testified that she presented the note

which was dated and signed for leave without pay so she could, "go see my therapist and figure things out and stuff". Plaintiff claims that Weiss ultimately said, "okay, fine, go".

Weiss admits that plaintiff gave her a note but claims that the note only addressed leave to cover plaintiff's time between the time she left that day and the end of her scheduled hours. Weiss claims that she did not make a copy of the note but that she gave the note to Casey as part of the documentation. However, Casey testified that she does not recall receiving a note from Weiss.

The record also contains conflicting testimony with respect to the events that transpired on June 4th and June 5th. Plaintiff testified that she filed an FMLA request:

> A.   So on the 4th when I was at the V.A. with my therapist, she and I walked the paperwork to HR. And I think I talked to HR on the 4th, because I remember saying that I would be in there that day, do you want me to drop it off.
>
> Q.   What was the purpose of your FMLA paperwork?
>
> A.   Exacerbation of my PTSD because of the situation, that i needed treatment and I was also undergoing different treatment for like - - they wanted to start physical therapy and stuff for my legs to see if that would help, but the main thing was because of what had just happened and my PTSD, they felt it exacerbated it.
>
> Q.   And did you learn whether that paperwork was approved?
>
> A.   I found out later that it wasn't approved or denied, because I was terminated. So it was never approved or denied. It was dismissed.

Pltf. Dep. at 46.

Plaintiff testified that she spoke with Terry Brew in Human Resources on June 5th and that Brew indicated that Human Resources received a "52 for resignation". Plaintiff testified:

> A.   . . . And I had told her that I didn't resign, I didn't sign anything, I didn't out process. It was my understanding that

> I was going to be doing this FMLA leave for the 30 days that the doctor said, and which is why I dropped off that paperwork the day before, which was the 4th. She was confused herself, didn't know what to say or make of it. Because she had said that the 52 form was send over, I think, on Wednesday. So my question was why was she telling me or her, Janet Curtin, whoever I talked to on the 4th, why were they telling me I needed FMLA paperwork if they're saying I didn't work there anymore. So she was all confused. And she had told me that the FMLA was done because they had sent off - - sent over that paperwork, which we just kept going back and forth because I didn't understand why that was send over when I had not resigned. And she didn't understand what was going on either.

Plaintiff testified that her last contact with Human Resources was a week later when they asked for her employee credit card and passes.

Weiss testified that Janet Curtin, an H.R. specialist, called her on June 5th to discuss plaintiff's FMLA request. Weiss told Janet that plaintiff was no longer an employee. Weiss testified that plaintiff never expressed any interest in nor did she have any discussions with anyone in the supervisory chain with regard to FMLA.

**c.    Analysis**

In support of summary judgment, defendant presents vague and conclusory arguments.. Despite the lack of a cohesive argument, the Court has reviewed the entire record. Based upon the testimony and documentary evidence, there are clear, material issues of fact with respect to how and when plaintiff's employment with defendant ended. There is evidence suggesting that plaintiff discussed resigning and indeed, plaintiff may have indicated to her supervisors and co-workers that she intended to resign. However, the record does not contain clear, uncontroverted evidence of such intent. To wit, the Request for Personnel Action indicates that the nature of the action is "resignation" however, the section of the form labeled Part E - Employee Resignation/Retirement is blank. Moreover, plaintiff's signature does not appear anywhere on

the form.  While Casey and Weiss both averred that plaintiff signature was not required on the

form, that testimony is seemingly belied by the document itself and clearly an issue for a jury to

resolve.  The record contains vague testimony with regard to the form including what portion

Casey completed and what information was supplied by Human Resources.  Weiss concedes that

plaintiff never signed a letter of resignation.  The only admissible, competent evidence that

plaintiff intended to resign is her email to Ms. Peters.  Plaintiff admitted sending the email

however, she testified that she subsequently decided that she needed to speak with her "advocate"

regarding the events that transpired that day.  Therefore, she refused to sign the "Form 52" and

opted to take it home instead.  There are also conflicting accounts of the substance of a

handwritten note plaintiff provided to Weiss before her departure.  A reasonable juror could

conclude that had plaintiff intended to resign, she would not have provided Weiss with a note

requesting leave without pay.  Plaintiff's co-worker, Yvonne Natale, testified that she spoke with

plaintiff immediately before she left the building on June 3, 2009 and plaintiff stated that she was

too upset to stay that day.  Natale testified that plaintiff did not tell her that she was resigning.

Plaintiff admits that she forwarded an email to Peters and that she "mentioned" resigning.

However, based upon plaintiff's deposition testimony and the events that occurred after the email

exchange, the Court cannot conclude, as a matter of law, that plaintiff resigned her position.

Plaintiff took no "affirmative steps" to effectuate her resignation.  *Cf. Hammon v. DHL Airways,*

*Inc.*, 980 F.Supp. 919, 924 (S.D.Ohio 1997) (the record lacked a letter of resignation but plaintiff

constructively resigned his position when he failed to respond to defendant's requests).  Indeed,

on June 4, 2009 and June 5, 2009, two days after plaintiff allegedly resigned, she provided

additional medical documentation to support her accommodation request and contacted Human

Resources regarding her both this request and her request for FMLA leave.  In December 2009,

Janet Curtin and Terri Brew testified before EEO Investigator, Isabel Simmons.[11] Curtin testified

that she "understood that Ms. Lupe had resigned on June 3, 2009" but admitted that she could not

recall who informed her of plaintiff's resignation.  Brew testified that plaintiff called several times

(she could not recall dates) regarding the procedures for FMLA leave.  Brew also testified that

plaintiff called her on June 3, 2009 stating that she was resigning and would "clear" the next day.

However, Brew later testified that she received a call from plaintiff on June 5, 2009:

> Q.   Okay.  When she called on June 5, what was it that she was
> wanting to know?
>
> A.   Janet Curtin was not in the office, so the documentation was
> left for me in my office.  And she wanted to make sure that I
> had received it.
>
> Q.   Okay.
>
> A.   And when I did let her know, I confirmed that I had received
> it, I also advised her by the way I also received the 52 for your
> resignation, and at that point she advised me that she had not
> resigned, and then sent an e-mail to that effect following up on
> the conversation.
>
> Q.   Okay.  So you sent her an e-mail?
>
> A.   No, she sent me one saying she did not resign in the email.[12]

Ms. Brew testified that she spoke with "someone in Central Office" who told her that the

"52" was an appropriate resignation but she could not recall who she spoke with.

Moreover, progress notes from plaintiff's social worker and case manager reveal that

plaintiff discussed FMLA in May 2009 and obtained the forms from Donovan.  While the record

does not contain any affidavit or admissible testimony from Deane or Donovan, defendant

---

[11]  The transcripts are part of defendant's Exhibit "G".

[12] The email is not part of the record herein.

included their Progress Notes as part of the Statement of Material Facts and therefore, does not dispute the authenticity of the records.

Defendant's motion includes an exhibit entitled "Department of Veterans Affairs Office of Resolution Management Investigative File" (Def. Exhibit "G").  Defendant makes no reference to this exhibit in the motion papers and the voluminous exhibit is not in proper admissible form. However, the exhibit contains signed statements from Weiss and Casey.  While these statements have not been authenticated through sworn testimony or affidavit by either witness, even assuming they are admissible, the statements only create additional questions of fact with regard to whether plaintiff carried through with her intent to resign.  Specifically, Casey's statement provides:"[s]he left without signing the 52 - she took the second part with her stating she need [sic] her advocate to assist her with the form and she would be back tomorrow 6/4 to clear".  Similarly, Weiss stated, "Ms. Lupe stated she would return on June 4 to provide the employee statement on the 52 as to the reason for her resignation and she would also clear station on June 4".[13]

A reasonable juror could conclude that plaintiff would not have pursued her reasonable accommodation request or FMLA leave one day after resigning if she, in fact, resigned or intended to resign.  On a motion for summary judgment, the court should not weigh evidence or assess the credibility of witnesses.  *Nelson v. Metro–North Commuter R.R.*, 235 F.3d 101, 104 (2d Cir.2000).  These determinations are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citation omitted).  Here, the Court cannot resolve the factual discrepancies without weighing the credibility of the witnesses or determining the amount of weight accorded to each account of the incident.  Viewing the evidence in a light most

---

[13] Exhibit "G" also contains a statement from Mitzi Merlino, plaintiff's co-worker, however the statement is not in proper admissible form and cannot be considered in the context of the within motion.

favorable to the nonmovant, as the Court must do on a motion for summary judgment, the Court

finds that there is a genuine issues of fact about how plaintiff's employment with defendant came

to a conclusion.  *See Jackson v. Longistics Transp., Inc,.* 2012 WL 1252543, at *11 (W.D. Tenn.

2012).  Accordingly, the Court cannot conclude, as a matter of law, which party was responsible

for terminating the interactive process.  Thus, defendant's motion for summary judgment and

dismissal of plaintiff's failure to accommodate cause of action is denied.

**B.      INTENTIONAL DISCRIMINATION**

Plaintiff claims that she was discriminated against because defendant treated her

differently based on her disabilities.  A plaintiff makes out a *prima facie* case of discrimination

under the Act by showing: (1) she is a disabled person under the Act; (2) she is otherwise

qualified to perform her job; (3) an adverse action was taken against her because of her disability;

and (4) the employer is a recipient of Federal financial assistance.  *Heilweil*, 32 F.3d at 722

(citations omitted).  As discussed in Part IIA(1), plaintiff is a disabled person within the meaning

of the Act and the issue of whether she was otherwise qualified to perform her job is for the jury

to resolve.  Even assuming plaintiff was qualified to perform her job, defendant claims that

plaintiff did not suffer an adverse employment action.

**1.      Adverse Employment Action**

An adverse employment action under the Rehabilitation Act, just as under other

employment discrimination statutes, is a " 'materially adverse change in the terms and conditions

of employment".  *Carter v. Potter*, 2008 WL 1848639, at *3 (E.D.N.Y. 2008) (citing, *inter alia*,

*Leget v. Henderson*, 2001 WL 43615, at *5 (S.D.N.Y. 2001) (treating the definition of an adverse

employment action under Rehabilitation Act identically to the definition of an adverse

employment action under Title VII)).  Such an action must be more disruptive than a mere

inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices. *Patrolmen's Benevolent Ass'n. of City of New York v. City*, 310 F.3d 43, 51 (2d Cir. 2002) (citation omitted). An adverse action may or may not entail economic loss but there must be a link between the discrimination and some "tangible job benefits" such as "compensation, terms, conditions or privileges" of employment. *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal citation omitted). Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006). "While adverse employment actions extend beyond readily quantifiable losses, "not everything that makes an employee unhappy is an actionable adverse action." *Phillips v. Bowen*, 278 F.3d 103, 117 (2d Cir.2002). "While there is no bright-line rule as to what constitutes an adverse employment action, the Second Circuit emphasizes that 'not every unpleasant matter short of [termination or demotion] creates a cause of action.' " *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997).

Here, plaintiff alleges that she suffered from several adverse employment actions including: (1) being threatened and demeaned, (2) being falsely imprisoned which caused her to black out, (3) a breach of plaintiff's confidentiality by disclosing her personal information and (4) termination. Plaintiff further alleges that these events were "remarkably close in time to plaintiff's submission of her accommodation request".

     **a.**     **Threatened or Demeaned/Falsely Imprisoned/Breach of Confidentiality**

Applying the appropriate standard, the Court finds that plaintiff cannot establish a *prima facie* case based upon being threatened or demeaned, being falsely imprisoned or disclosure of personal information to a co-worker.  None of the aforementioned actions resulted in material changes in the terms or conditions of her employment.  The alleged actions did not adversely affect her pay or benefits nor did they result in negative evaluations or formal reprimands.  *See Koniczny v. New York State Div. of Parole*, 647 F.Supp.2d 256, 262 (W.D.N.Y. 2009); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).  Plaintiff has not alleged that she was subject to any discipline, demotion, or other punishment as a result of these incidents.  Plaintiff also failed to offer any admissible evidence to support her assertion that she was falsely imprisoned.  *See Fahmy v. Duane Reade, Inc*., 2006 WL 1582084, at *10 (S.D.N.Y. 2006) (the plaintiff could not sustain a cause of action for discrimination claiming that he was framed for stealing without competent admissible evidence).  Accordingly, to the extent that plaintiff's intentional discrimination claim is based upon these three instances, defendant's motion is granted.

### b.    Termination

The Court reaches a different result with respect to plaintiff's claim that she was subjected to an adverse action when she was terminated.   Termination of employment is an adverse employment action sufficient to support a *prima facie* case of disability discrimination under the ADA. *Sista v. CDC Ixis N. Am., Inc*., 445 F.3d 161, 169 (2d Cir. 2006) (asserting that there is not "any question that termination is an adverse employment action").

Assuming plaintiff suffered from an adverse action, plaintiff must then establish that the adverse employment action occurred under circumstances that would support an inference of discrimination.  *Nakis v. Potter*, 422 F.Supp.2d 398, 421 (S.D.N.Y. 2006).  The nexus need not be

direct and there is no requirement that discriminatory animus be the sole cause of any adverse action.  *Id*. The Second Circuit has noted that "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision," *see Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir.1996). The time or sequence of events leading to plaintiff's termination give rise to an inference of discrimination.  *Id*.  "Depending on the specific facts of the case, temporal proximity can contribute to an inference of discrimination."  *Trujillo v. PacifiCorp*., 524 F.3d 1149, 1157 (10th Cir. 2008) (citing *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736,749 (10th Cir. 1999) (temporal proximity between ADA plaintiff's request for accommodation and decline in his work evaluations and satisfaction with his work performance contributed to discriminatory inference)). The closer in time a protected action is followed by an adverse action, the more likely temporal proximity will support an inference of discrimination. *Id*. (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999)).  Where the temporal proximity is close, it is a circumstance that should be given considerable weight.  *Id*.

Here, as the Court thoroughly discussed previously, there is an issue of fact with respect to whether plaintiff resigned or was terminated.  However, assuming plaintiff was terminated, based upon the sequence of events, plaintiff has met her *de minimis* burden of establishing the inference of discrimination as a motive for her alleged termination.  The alleged termination occurred within three days of plaintiff submitting an accommodation request. Accordingly, a resolution of the conduct and circumstances surrounding plaintiff's dismissal are properly left to the trier of fact.  *See Chambers v. TRM Copy Ctr. Corp.* 43 F.3d 29, 40 (2d Cir. 1994).

      **2.**      **Legitimate, Non-Discriminatory Reasons and Pretext**

Pursuant to the *McDonnell Douglas* process, the burden shifts to defendant to articulate a non-discriminatory reason for the employment decisions.  If defendant meets that burden, plaintiff must establish that defendant's proffered explanation is merely pretext for illegal discrimination. Here, defendant explains that decisions were made based upon plaintiff's resignation not termination.  As previously discussed, the resolution of whether plaintiff resigned or was terminated is for the factfinder as it involves questions of credibility.  Therefore, defendant's motion for summary judgment and dismissal of plaintiff's intentional discrimination claim based upon plaintiff's alleged termination is denied.

## C.   RETALIATION

Retaliation against individuals asserting rights under the Rehabilitation Act is prohibited. *Adams v. New York State Thruway Auth.*, 2001 WL 874785, at *13 (N.D.N.Y. 2001) (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir.1991)).  In order to establish a *prima facie* case of retaliation under the Rehabilitation Act, a plaintiff must show: (1) that she engaged in protected activity, (2) that the defendant was aware of this activity, (3) that the defendant took adverse action against the plaintiff, and (4) that there is a causal connection between the protected activity and the adverse action.  *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 54.  "A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment [. . .].' " *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (citation omitted).  The Second Circuit has held that "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia*, 313 F.3d at 720.  Plaintiffs who resort solely to temporal proximity in proving causation must demonstrate the existence of a time frame that is "very close".  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).  There is no

"bright line" to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship. *Id.*

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Treglia*, 313 F.3d at 721. If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *See id.* Protected activity includes not only the filing of formal charges of discrimination, but also the informal protests of an employer's discriminatory practice, such as, "making complaints to management," and the request for a reasonable accommodation. *Adams* at *13 (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d. Cir.1990)).

Here, plaintiff claims that she engaged in two separate forms of protected activity: (1) she filed a reasonable accommodation request in May 2009; and (2) she complained about Weiss' behavior on June 3, 2009 to the VA's EEO officer. Defendant does not dispute that plaintiff engaged in protected activity nor does defendant claim that they were unaware of plaintiff's protected activities. Rather, defendant asserts that plaintiff did not suffer an adverse employment action because she resigned. If plaintiff was terminated, that termination constitutes an adverse employment action sufficient to satisfy this prong of plaintiff's *prima facie* case. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) *abrogated by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012).

As discussed in Part IIA, the issue of how plaintiff's employment ended is for a jury to resolve. However, assuming plaintiff was terminated, temporal proximity and circumstantial evidence support plaintiff's retaliation claim. The record establishes that plaintiff's employment

ended three days after she presented her request for accommodation during a June 1, 2009

meeting with Weiss and Casey and the same day that she reported Weiss' behavior to the EEO

representative.  The gap between plaintiff's protected activity and her termination is close enough

in time to support an inference that defendant terminated plaintiff in retaliation for asking for a

making a request for reasonable accommodation.  *See Constance v. Pepsi Bottling Co. of NY*,

2007 WL 2460688, at *35 (E.D.N.Y. 2007).  Viewing the evidence in a light most favorable to

plaintiff, the Court finds that plaintiff has established a *prima facie* case of retaliation.

As discussed in Parts IIA and IIB, even assuming defendant established a legitimate, non-

retaliatory reason for defendant's employment decisions, i.e., plaintiff resigned, plaintiff has

offered evidence of pretext and retaliatory motives for the alleged termination.  The record

presents genuine issues of fact with respect to the issue of retaliation as a reasonable jury could

find that defendant's decisions were motivated, at least in part, by retaliatory animus.  *See*

*Williams v. City of New York* , 2006 WL 2668211, at *22 (E.D.N.Y. 2006).  Therefore,

defendant's motion for summary judgment and dismissal of plaintiff's claim of retaliation is

denied.

## D.       HOSTILE WORK ENVIRONMENT

Plaintiff alleges that she was subjected to a hostile work environment based upon Weiss'

behavior on June 1, 2009 and June 3, 2009.  Specifically, plaintiff claims that Weiss: (1)

demeaned and physically threatened plaintiff causing an exacerbation of plaintiff's PTSD; and (2)

humiliated plaintiff causing her to suffer extreme emotional distress.

Although § 504 does not specifically address harassment claims, the few courts

considering this issue have held that hostile work environment harassment is actionable under the

Rehabilitation Act.  *Pell v. Tr. of Columbia Univ. in City of New York*, 1998 WL 19989, at *17

(S.D.N.Y. 1998).  The Second Circuit has not expressly ruled that the ADA permits a hostile work environment claim based on disability, however several courts in this district have recognized such claims.  *McGrath v. Thomson Reuters,* 2012 WL 2119112, at *15-16  (S.D.N.Y. 2012).

To succeed on a claim for hostile work environment, plaintiff must establish: "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer".  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).  The standard for establishing a hostile work environment is high, *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003), and a claim cannot be based upon vague, unsupported allegations.  *Thomas v. Bergdorff Goodman, Inc*., 2004 WL 2979960, at *7 (S.D.N.Y. 2004).

Plaintiff must prove both objective and subjective elements, i.e., that the conduct alleged is so severe and pervasive as to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. at 22.  The Supreme Court has held that a work environment's hostility should be assessed based on the "totality of the circumstances".  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citing *Harris*, 510 U.S. at 23).  Factors to consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  *Id*.  With respect to the frequency of the alleged conduct, it is not only how long the conduct lasts, but also the offensiveness of the actions that should be considered in determining whether such actions are pervasive.  *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 578

(2d Cir. 1989).   Isolated, minor episodes of harassment do not, however, merit relief.  *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997); *see also Ferguson v. New York City Transit Auth.*, 2005 WL 3149524, at *9 (E.D.N.Y. 2005) (holding that the plaintiff's claims, which occurred three months apart, were not severe or pervasive).   "[I]solated incidents of offensive conduct," which do not demonstrate harassment of such a quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. *Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir.2004).   However, even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace.  *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000).  A single incident must be extraordinarily severe to have altered the conditions of the plaintiff's environment.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  On a summary judgment motion, the Court must consider the totality of the circumstances and evaluate the quantity, frequency, and severity of the incidents in order to obtain a realistic view of the work environment.  *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999).

Defendant claims that two meetings cannot be found to be hostile and that based upon Weiss' and Casey's sworn testimony, the tone of the June 1, 2009 meeting was one that should have been expected in a work environment where there were differences of opinion.  Defendant claims that Merendo, Weiss and Casey's all provide consistent accounts of the events.  Moreover, VA privacy policy did not prohibit the exchange between Weiss and Dardaris.  Conversely, plaintiff claims she was physically threatened and verbally abused by Weiss.

As the Court has noted throughout this opinion, the witnesses provide drastically different versions of the events that transpired in Weiss' office on June 1, 2009.  Plaintiff testified:

> A.   . . . So the conversation got heated and I had to ask to leave the room to get some air.  And she wouldn't let me leave.  Finally

> I told her I don't want to be disrespectful, but I need to get out, I could feel the PTSD issues arising.  And I had gotten good at recognizing that.  And she got up and slammed the door and got pretty close in my face and just started yelling at me saying, well, now you are being disrespectful.  And I don't really remember what happened after that.

Pltf. Dep. at p. 21.

Weiss and Casey testified that the door was never closed and that plaintiff became angry during the course of the meeting.  Both witnesses deny that Weiss was screaming at plaintiff or that plaintiff suffered any physical symptoms including shortness of breath.

Plaintiff also testified that she confronted Weiss on June 3, 2009 about Weiss' conversation with Dardaris and that Weiss became "upset" and the "tone of her voice got louder".

Even viewing the evidence in a light most favorable to plaintiff, based upon the record, no reasonable person would conclude that these two isolated instances involving Weiss raising her voice to plaintiff or becoming "upset" with plaintiff amounted to a workplace that "was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of plaintiff's work environment."  *Elhanafy v. Shinseki*, 2012 WL 2122178, at \*17 (E.D.N.Y. 2012) (citing *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003)). "[B]eing addressed in a loud, unprofessional tone during one meeting does not satisfy the requirement that the offensive conduct be severe and pervasive."  *Atanus v. Perry*,  520 F.3d 662, 676 (7th Cir. 2008).  The record does not contain any evidence that Weiss demeaned or humiliated plaintiff at any other time.  Moreover, as discussed, plaintiff has not provided any admissible, competent evidence to establish that any physical contact and/or altercation occurred between plaintiff and Weiss. Accordingly, the City is entitled to summary judgment and dismissal of plaintiff's hostile work environment claims under Title VII.

**E.      CONSTRUCTIVE DISCHARGE**

Plaintiff claims that Weiss' threatening behavior on June 1, 2009 was so objectively intolerable that a reasonable person would have felt compelled to resign.  "To establish a 'constructive discharge,' a plaintiff must show that the employer deliberately ma[de her] working conditions so intolerable that [she was] forced into an involuntary resignation."  *Miller v. Batesville Casket Co., Inc*., 312 F. App'x 404, 406 (2d Cir. 2009) (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993) (internal quotation marks omitted)).  An employee who does not resign cannot claim constructive discharge.  *Richmond-Hopes v. City of Cleveland*, 168 F.3d 490 (6th Cir. 1998); *see also Roberts v. Unitrin Specialty Lines Ins. Co.,* 405 F. App'x 874, 879 (5th Cir. 2010) (if an employee claims that she was terminated and asserts that she did not resign, any claim for constructive discharge claim lacks merit); *see also Punsal v. Mount Sinai Serv. of Mount Sinai Sch. of Med.*, 2004 WL 736892, at *8 (S.D.N.Y. 2004).

On the within motion, plaintiff presents conflicting arguments.  To wit, in support of her intentional discrimination claim, plaintiff "adamantly argues" that she was terminated.  Conversely, in support of a claim of constructive discharge, plaintiff asserts that defendant's actions, "were so intolerable that a reasonable person could feel compelled to resign".   Upon review of plaintiff's own sworn testimony, the Court finds that the record does not support a claim of constructive discharge.  During her deposition, plaintiff continually testified that despite her emails to Peters, she did not plan to resign.  Moreover, plaintiff emphasized that she only intended to leave for the day because she was "overwhelmed" by the events.

As plaintiff claims throughout her opposition to the motion and in her sworn statements that she was terminated, plaintiff cannot sustain a cause of action for constructive discharge.  Accordingly, this portion of defendant's motion is granted.

41

**III.    PLAINTIFF'S REQUESTS FOR RELIEF**

**A.    Punitive Damages**

In the complaint, plaintiff seeks an award of punitive damages.  In *Barnes v. Gorman*, 536 U.S. 181 (2002), the Supreme Court held:

> Because punitive damages may not be awarded in private suits brought under Title VI of the 1964 Civil Rights Act, it follows that they may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act.

This holding has consistently been applied by various Circuit Courts.  Plaintiff disagrees and argues that punitive damages are available under the Rehabilitation Act.  However, the caselaw that plaintiff relies upon pre-dates the Supreme Court holding in *Barnes*.  *See Tolbert v. Queens Coll.*, 242 F.3d 58 (2d Cir. 2001); *DeLeo v. City of Stamford*, 919 F.Supp. 70 (D.Conn. 1995).  The Court has reviewed the one case cited by plaintiff that post-dates Barnes, *Schmelzer ex rel. Schmelzer v. New York*, 363 F.Supp.2d 453 (E.D.N.Y. 2003), and finds that plaintiff misinterprets the holding.  The Court stated, in the context of an analysis of Eleventh Amendment immunity:

> The Second Circuit in *Garcia* held that suits seeking a monetary award from a state under Title II must show ill will or animus.  The court explicitly noted that "actions by private individuals for injunctive relief for state violations of Title II have not been foreclosed by today's decisions." The court also held that New York did not waive its sovereign immunity when it accepted funds pursuant to Section 504, but that monetary damages can be had upon a showing of deliberate indifference. Garcia is generally inapplicable to the case at bar, except to the extent that Plaintiffs seek monetary damages. Plaintiffs have failed to prove deliberate indifference to support their claim under Section 504. While it is clear that the State is in noncompliance, Plaintiffs have not shown that such noncompliance is a result of anything other than a large number of appeals to the SRO. Plaintiffs' claims for injunctive relief are sustained.

The district court continued:

42

> In *Barnes v. Gorman*, 536 U.S. 181 (2002), the Supreme Court found
> that punitive damages are not available under the ADA and
> Rehabilitation Act in private suits. The Court did note that punitive
> damages are different in nature from compensatory or injunctive relief
> and did not in any way limit such forms of damages.  It found that
> compensatory and injunctive damages are types that are generally
> available for breach of a contract. The Court used this analogy because
> the federal funding recipient is on notice, as is a party to a contract,
> that it may be subject to such forms of relief.

Accordingly, based upon the *Barnes* holding and it progeny, plaintiff's claim for punitive

damages is dismissed.

### B.    Reinstatement

"The Rehabilitation Act makes available in disability discrimination cases the remedies

authorized by Title VII of the Civil Rights Act of 1964, see 29 U.S.C. § 794a(a)(1), and Title VII,

in turn, provides that a court may order 'affirmative action . . . which may include, but is not

limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other

equitable relief as the court deems appropriate'". *Lussier v. Runyon,* 50 F.3d 1103, 1107 (1st Cir.

1995) (citing 42 U.S.C. § 2000e-5(g)); *see also Frye v. Aspin,* 997 F.2d 426, 428 (8th Cir. 1993)

(if successful, a Rehabilitation Act plaintiff is entitled to the equitable remedy of reinstatement).

In the complaint, plaintiff seeks, "[a]ll appropriate equitable relief, including but not

limited to a suitable position with the VA . . .".  Defendant claims that plaintiff is not entitled to

this relief because she has been receiving Social Security Disability payments since 2009.

Plaintiff claims that she may, some time in the future, be able to hold a full time job.  Moreover,

plaintiff testified that currently, she could perform an administrative-type position if she was

given accommodations with respect to transportation and placement in an office where she would

be sitting.  As discussed in Part II(A)(2)(a), the fact that plaintiff is receiving Social Security

Disability is not dispositive in terms of her ability to perform her job.  Accordingly, defendant's motion to dismiss plaintiff's claim for reinstatement is denied.

## CONCLUSION

**It is hereby**

**ORDERED** that defendant's motion for summary judgment and dismissal (Dkt. No. 20) of plaintiff's hostile work environment claims is **GRANTED**; it is further

**ORDERED** that defendant's motion for summary judgment and dismissal (Dkt. No. 20) of plaintiff's claim of constructive discharge is **GRANTED**; it is further

**ORDERED** that defendant's motion to dismiss plaintiff's claim (Dkt. No. 20) for punitive damages under the Rehabilitation Act is **GRANTED**; it is further

**ORDERED** that defendant's motion for summary judgment and dismissal of plaintiff's intentional discrimination claims is **GRANTED IN PART AND DENIED IN PART** consistent with the provisions of this Order; it is further

**ORDERED** that defendant's motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 20) is **DENIED** in all other respects.

**ORDERED** that a Settlement Conference is scheduled in this matter for November 13, 2012 at 10:00 A.M.  in Albany.  The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference which will be forthcoming.

**IT IS SO ORDERED.**

Dated:  August 24, 2012
           Albany, New York

Mae A. D'Agostino
U.S. District Judge